John PIERCE and Thomas
Stepnick, Plaintiffs,

v.

ALLEGHENY COUNTY BOARD
OF ELECTIONS, Defendant,

and

Pennsylvania Democratic State Committee, Dan Onorato, and Friends of Dan Onorato, Intervenors-defendants.

No. CIV.A. 03–1677.

United States District Court,
W.D. Pennsylvania.

Nov. 13, 2003.

Ronald L. Hicks, Meyer, Unkovic & Scott, Pittsburgh, PA, for plaintiffs.

Clifford B. Levine, Alice B. Mitinger, David J. Montgomery, Jennifer A. Schnore, Thorp, Reed & Armstrong, Pittsburgh, PA, for intervenors-defendants.

### MEMORANDUM ORDER

CONTI, District Judge.

Pending before this court are two motions. The first motion—a motion for a temporary restraining order—was brought by John Pierce and Thomas Stepnick, Allegheny County voters and Republican candidates for Allegheny County Treasurer and Register of Wills ("plaintiffs"), respectively, requesting the court: (1) to enjoin the Allegheny County Board of Elections ("defendant" or the "Board of Elections") from permitting third-party delivery of absentee ballots in Allegheny County; (2) to require defendant to set aside all absentee ballots delivered by a third-party in connection with the November 4, 2003 election; and (3) to prohibit those ballots from being delivered to local election districts after having been commingled with the other absentee ballots, a practice that would render a challenge impossible. Plaintiffs further requested that the temporary restraining order be converted to a preliminary and permanent injunction.

The second motion—a motion to dismiss—was filed by intervenors Pennsylvania Democratic State Committee, Dan Onorato, and Friends of Dan Onorato ("intervenors"). In the motion to dismiss, intervenors argue, *inter alia*, that plaintiffs lack standing, this court lacks subject-matter jurisdiction, plaintiffs fail to state claims upon which relief can be granted, and abstention is warranted. On October 31, 2003, and November 3, 2003, the parties presented arguments and evidence.

After consideration of the parties' submissions, arguments, and evidence, the court finds plaintiffs have standing and this court has subject-matter jurisdiction. The court also finds that, while abstention is appropriate under the *Pullman* doctrine, the court must be mindful of its continuing duty to consider plaintiffs' motion for a temporary restraining order/preliminary injunction despite abstention. After considering plaintiffs' motion and the factors requisite for granting a preliminary injunction, the court grants plaintiffs' motion for a temporary restraining order/preliminary injunction in part, by issuing a limited preliminary injunction whereby the 937 hand-delivered absentee ballots at issue are held to be "challenged" ballots. Intervenors' motion to dismiss is granted in part by finding that plaintiffs failed to state claims with respect to their fundamental rights as candidates and civil conspiracy. As to plaintiffs' remaining claims—founded on plaintiffs' fundamental right to vote and to have those votes weighted equally, as well as on defendant's violation of the election code—intervenors' motion to dismiss is denied.

### PROCEDURAL HISTORY

On Friday, October 31, 2003, plaintiffs filed a complaint seeking injunctive relief in the Court of Common Pleas of Allegheny County, No. GD 03–21662. On the same day, plaintiffs filed an almost identical complaint in federal court requesting injunctive relief. The federal complaint

was accompanied by a motion for a temporary restraining order. On the afternoon of October 31, 2003, the court held an emergency hearing with regard to the temporary restraining order. Immediately following the hearing, the court issued a temporary restraining order, pursuant to Rule 65 of the Federal Rules of Civil Procedure, to prevent defendant from commingling the hand-delivered absentee ballots with the other absentee ballots mailed to defendant until the following Monday, November 3, 2003, when the October 31, 2003 hearing was to be continued. This temporary restraining order impacted 937 hand-delivered absentee ballots.

On November 3, 2003, at approximately 8:37 a.m., plaintiffs entered a praecipe to discontinue the action in state court, filed at No. GD 03–21662. That same day, this court held a day-long hearing with regard to the temporary restraining order/preliminary injunction. The court reserved its ruling until the following morning and continued the temporary restraining order entered on October 31, 2003.

On the morning of November 4, 2003, the court held that the temporary restraining order issued on October 31, 2003, was to be continued as a preliminary injunction and the 937 hand-delivered absentee ballots were to be deemed "challenged" under Pennsylvania law. The court further held, *inter alia*, that the 937 challenged hand-delivered absentee ballots were to remain set aside in a secure location at the office of the Board of Elections.

The court also ordered that the challenges were to take place consistent with the Pennsylvania Election Code ("election code"), 25 PA. STAT. ANN. § 3146.8(e), in the same manner and subject to the same procedures and appeal rights as other challenges under that law. This opinion sets forth in further detail the rationale for the court's November 4, 2003 order, which was entered on the record.

*FINDINGS OF FACT*

**I. There was no fraud by any person or party—only irregularities in defendant's acceptance of third-party hand-delivered absentee ballots**

The court finds that there was no evidence that any person, party or candidate engaged in any fraud or conspiracy to impede or interfere with the November 4, 2003 election in Allegheny County. Rather, the court finds that the evidence demonstrates that there were irregularities in the Board of Elections' acceptance of hand-delivered absentee ballots. These irregularities stemmed from the Board of Elections' implementation of inconsistent policies between October 6, 2003, when the absentee ballots were mailed to electors, and October 31, 2003, the date when absentee ballots had to be returned to the Board of Elections by 5:00 p.m., as required by 25 PA. STAT. ANN. § 3146.6(a).

**II. The Board of Elections implemented three different policies with regard to hand delivery of absentee ballots**

The court finds that not only were the Board of Elections' three policies inconsistent with each other, but they were also likely inconsistent with a strict reading of 25 PA. STAT. ANN. § 3146.6(a) and the manner in which that law has been interpreted and applied in at least one other Pennsylvania county. *See Marks v. Stinson*, 19 F.3d 873 (3d Cir.1994), *remanded to Marks v. Stinson*, No. Civ. A. 93–6157, 1994 WL 146113, at *31 (E.D.Pa. April 26, 1994) ("Pennsylvania law requires that the voter complete the absentee ballot and return it either by mail or in person"); *Di-Pietrae v. City of Philadelphia*, 666 A.2d 1132, 1135 (Pa.Cmwlth.1995), *aff'd.*, 543 Pa. 591, 673 A.2d 905 (1996) (concluding that, subject to certain restrictions, disabled

persons may designate an agent to hand deliver their absentee ballots for them).

The court also finds that the Board of Elections failed to publish its three policies in a manner likely to notify the general public of its existing policies and policy changes. Members of the general public who applied for absentee ballots received written instructions stating that they had to "mail or deliver in person" the absentee ballot. Pls.' Ex. 2. That form of notice was required by statute. 25 PA. STAT. ANN §§ 3146.4, 3146.6. The notice, however, made no reference to the Board of Elections' policies, which did not consistently reflect these written instructions. As a result, the Board of Elections accepted 937 hand-delivered absentee ballots under three different policies.

The first policy, which was not published or embodied in any written notice, rule, or regulation, had been in effect for a number of years in Allegheny County. Under that policy, third parties were permitted to return absentee ballots to the Board of Elections without any restrictions. On October 22, 2003, after the Republican Party notified the Board of Elections of its concerns regarding the long-standing Allegheny County practice of allowing absentee ballots to be hand-delivered by third parties, the Chair of the Board of Elections adopted an interim policy that prohibited third parties from returning absentee ballots to the Board of Elections and required the voter to either mail the absentee ballot or appear in person to deliver the absentee ballot. In other words, third-party hand-delivery of absentee ballots was precluded. This second policy was inconsistent with the holding in *DiPietrae v. City of Philadelphia*, 666 A.2d at 1135, where the Pennsylvania Commonwealth Court upheld the order of the lower court which permitted disabled voters to appoint a person to deliver an absentee ballot to the mailbox or to the Philadelphia County Board of Elec-

tions. This second policy also implicated a possible violation of the Americans with Disabilities Act, 42 U.S.C. § 12132, which has been interpreted to impose a duty upon local government agencies to assure that all persons with disabilities are effectively able to exercise their right to vote, and the Federal Voting Rights Act, 42 U.S.C. § 1973aa–6, which requires that any voter needing assistance because of a disability be given assistance by a person of the voter's choice. *Id.*

On October 27, 2003, the Board of Elections held a meeting to consider the appropriate policy for accepting hand-delivered absentee ballots. Representatives from both the Republican and Democratic parties were present. At the conclusion of the meeting, the Board of Elections implemented a third policy, effective immediately, that allowed third parties to hand deliver absentee ballots to the Board of Elections as long as the agent returning the ballot for the elector completed a "Certification of Designated Agent" ("certification"). The certification required, among other things, the agent to provide his or her name, address, signature, and the date, as well as the name and address of the absentee voter. The agent was also required to provide photo identification.

Ninety-six certifications were provided between October 27, 2003 and October 31, 2003, impacting 97 absentee votes. Upon close examination of the certifications, the court finds that not all of the certifications contained the requisite information or were completed in a uniform manner. For example, at least one of the certifications indicated that the agent was returning the ballot on behalf of a registered corporation instead of an absentee voter. Another example is that five certifications failed to note the type of photo identification, if any, that the agent provided.

### III. The November 4, 2003 election was not limited to candidates and issues within Allegheny County

The specimen absentee ballot admitted into evidence indicated that the November 4, 2003 election in Allegheny County included an election of a Pennsylvania Supreme Court Justice, the election of three Pennsylvania Superior Court Judges, and several statewide judicial retention elections. Pls.' ex. 2. Additionally, there were two proposed amendments to the Pennsylvania Constitution. Thus, the 937 hand-delivered absentee ballots were capable of impacting the results of not only local Allegheny County elections, but also statewide elections and issues.

### IV. Without judicial intervention, the hand-delivered absentee ballots would be unidentifiable

Based upon testimony of Allegheny County's Election Division Manager, Mr. Mark Wolosik, the court finds that absent judicial intervention, the Board of Elections would have commingled the hand-delivered absentee ballots with mail-delivered absentee ballots and delivered the commingled absentee ballots to each of the county's 1307 precincts. At the precincts, the commingled absentee ballots would have been opened and counted, in effect preventing anyone from being able to identify the 937 hand-delivered absentee ballots. Specifically, Mr. Wolosik testified that all hand-delivered absentee ballots would be commingled with the other mail-delivered ballots, making it impossible to identify which of the ballots were the hand-delivered absentee ballots. Another elections official, Mr. Norman B. Mekkleson, Director of the Allegheny County Department of Administrative Services, testified that on past occasions, local judges of elections opened and counted absentee ballots prior to 8:00 p.m. on the night of the election, the time when the polls officially close. The court finds that injunctive relief is necessary to preclude the commingling of absentee ballots and to provide an opportunity for the 937 hand-delivered ballots to be challenged in the state courts.

### DISCUSSION

Plaintiffs allege that defendant failed to enforce a provision of the election code, specifically 25 PA. STAT. ANN. § 3146.6(a), which provides that an elector voting by absentee ballot is to mail the absentee ballot or deliver it in person.[1] As a result of the lack of consistent enforcement of that law, plaintiffs contend that injunctive relief is necessary to prevent the hand-delivered absentee ballots from being commingled with the other absentee ballots. If relief is not granted, the hand-delivered ballots would be rendered unidentifiable and any practical opportunity for the ballots to be challenged would be eliminated.

---

1. Specifically, section 3146.6 provides, in pertinent part:

 (a) At any time after receiving an official absentee ballot, but on or before five o'clock P.M. on the Friday prior to the primary or election, the elector shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black-ink, in fountain pen or ball point pen, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Official Absentee Ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector. The elector shall then fill out, date and sign the declaration printed on such envelope. Such envelope shall then be securely sealed and **the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of election**. . . .
 (Emphasis added).

There are two main issues the court identifies in this case. First, whether this case should be dismissed for lack of standing, lack of subject-matter jurisdiction, and/or failure to state a claim upon which relief may be granted; and second, whether the court should abstain from addressing the merits of plaintiffs' claims and/or grant plaintiffs' requested injunctive relief. The court addresses these issues below.

## I. Plaintiffs Have Standing, This Court Has Jurisdiction and the Complaint States a Claim

Plaintiffs assert federal subject-matter jurisdiction pursuant to 42 U.S.C. § 1983, alleging that defendant's policy of accepting third-party hand-delivery of absentee ballots violates plaintiffs' First and Fourteenth Amendment rights under the United States Constitution. Specifically, plaintiffs allege that defendant's policy (1) infringed plaintiffs' constitutionally-protected right to run for public office, and (2) violated plaintiffs' constitutionally-protected right to vote and to have their votes weighted equally with respect to fellow Allegheny County voters. Plaintiffs further invoke the supplemental jurisdiction of this court pursuant to 28 U.S.C. § 1367, claiming that defendant's policy of allowing absentee ballots to be hand-delivered by a third-party violated 25 Pa. Stat. Ann. § 3146.6, and that defendant's policy amounted to a civil conspiracy under Pennsylvania law. Intervenors raise several issues regarding whether the case should be dismissed, including that plaintiffs lack standing and that the *Rooker–Feldman* doctrine applies to bar this court from exercising subject-matter jurisdiction. Intervenors further seek to dismiss this case pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that plaintiffs' complaint fails to state a claim upon which relief can be granted.

### A. Plaintiffs Have Standing

Intervenors argue that plaintiffs' complaint should be dismissed for lack of standing. A plaintiff has standing in federal court if the party can allege an injury in fact caused by the defendant that can be redressed by the courts. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The injury must be concrete and particularized, as well as "actual or imminent, not conjectural or hypothetical." *Id.* (internal quotations and citations omitted). The causation prong requires that the injury be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Bennett v. Spear*, 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Redressability examines whether the relief sought, if granted by the court, will likely alleviate the particularized injury alleged by the plaintiff. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

■ Here, plaintiffs, who are voters, pled a sufficient injury by alleging that, if this court does not act, there will be no mechanism by which absentee ballots could be challenged for alleged violations of the election code and the United States Constitution. The causation and redressability prongs are also met in this case. Based upon the evidence presented, it is clear that plaintiffs' challenges are traceable to defendant's implementation of three different policies that appear inconsistent with a strict interpretation of the election code and are also inconsistent with the policy in at least one other county. With regard to the redressability prong, the relief that plaintiffs request in part—setting aside the hand-delivered absentee ballots so that they are not commingled with the

other ballots—would alleviate plaintiffs' alleged injury and provide an opportunity to challenge the ballots. Therefore, plaintiffs have standing to request a remedy with regard to the 937 hand-delivered absentee ballots that the Board of Elections accepted under three inconsistent policies.

### B. The Rooker–Feldman Doctrine Does Not Apply in This Case to Bar The Court From Asserting Subject–Matter Jurisdiction

██ The *Rooker–Feldman* doctrine embodies the principles set forth by the United States Supreme Court in *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), and *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923). The doctrine states that "lower federal courts lack subject matter jurisdiction to engage in appellate review of state court determinations or to evaluate constitutional claims that are 'inextricably intertwined with the state court's [decision] in a judicial proceeding.' " *Port Authority Police Benevolent Ass'n, Inc. v. Port Authority of New York,* 973 F.2d 169, 177 (citing *Feldman,* 460 U.S. at 483 n. 16, 103 S.Ct. 1303). *See also Blake v. Papadakos,* 953 F.2d 68, 71 (3d Cir.1992) (citing, *inter alia, D.C. Court of Appeals v. Feldman,* 460 U.S. 462, 483 n. 16, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983) and *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923)). In this case, by reason of plaintiffs filing a praecipe to discontinue the state court action on November 3, 2003, plaintiffs are not raising their constitutional claims in a state court proceeding. Because no final decision from a state court is implicated in this case, the *Rooker–Feldman* doctrine is inapplicable and does not bar the court from exercising subject-matter jurisdiction.

### C. Plaintiffs' State Valid Claims Relating to the Equal Protection Clause of the Fourteenth Amendment and the Pennsylvania Election Code

#### 1. Standard for Motion to Dismiss For Failure to State a Claim

A motion to dismiss for failure to state a claim tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). In deciding a motion to dismiss the court is not opining on whether the plaintiff will be likely to prevail on the merits. Rather, when considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins,* 281 F.3d 383, 388 (3d Cir.2002). The pleader is required to "set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist." *Kost,* 1 F.3d at 183 (citing 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed.1990)). A motion to dismiss will only be granted if it appears that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief. *Id.* Moreover, the court is under a duty to examine the complaint independently to determine if the factual allegations set forth could provide relief under any viable legal theory. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

#### 2. Plaintiffs' Fail to State a Claim in Their Capacity as Candidates

██ In the verified complaint, plaintiffs invoke this court's jurisdiction by alleging that defendant's policy of accepting third-party delivery of absentee ballots violated their First and Fourteenth Amendments' rights as candidates. There are no express constitutional provisions guaranteeing the right to become a candidate. 3 Rotunda and Nowak, Treatise on Constitu-

TIONAL LAW 706 (3d ed.1999). Where a state, however, employs restrictions on the ability of a candidate to run for public office, constitutional provisions of general application, such as the First and Fourteenth Amendments, may be violated. *Id.* For example, where a state restricts the ability of a candidate or a political party to be placed on state ballots, the First Amendment right to freedom of association and the Fourteenth Amendment right to equal protection under the law may be infringed. *See Williams v. Rhodes,* 393 U.S. 23, 30–31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (Ohio election law severely restricting the ability of Socialist Party to be placed on ballot to choose a slate of presidential electors held unconstitutional); *Bullock v. Carter,* 405 U.S. 134, 149, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (Texas election law requiring primary candidates to pay expensive filing fees held to unconstitutionally violate candidates' equal protection rights and voters' First Amendment rights of free association). *But see Anderson v. Celebreeze,* 460 U.S. 780, 806, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (Ohio election law requiring independent party candidate to be placed on ballot for November presidential election by March of same year unconstitutionally burdened the voting and associational rights of independent candidate's supporters, *not the candidate himself*).

■ In this case, plaintiffs did not allege that defendant restricted their ability to be placed on the ballot for the November 4, 2003 election. In fact, a copy of the absentee ballot to be used in the election clearly shows that plaintiffs' names have been placed on the ballot. Pls.' ex. 2. Thus,

there is no valid First Amendment claim that defendant restricted plaintiffs' right of free association or that defendant's actions denied plaintiffs equal protection under the law in their capacity *as candidates.* Furthermore, the United States Supreme Court held that there is no right under the privileges and immunities clause of the Fourteenth Amendment to become a candidate for a state office: "[t]he right to become a candidate for *state* office, like the right to vote for the election of state officers is a right or privilege of *state* citizenship, not of national citizenship which alone is protected by the privileges and immunities clause." *Snowden v. Hughes,* 321 U.S. 1, 7, 64 S.Ct. 397, 88 L.Ed. 497 (1944) (emphasis added). By reason of plaintiffs' failure to allege that defendant restricted plaintiffs' access to the ballot or placed unconstitutional conditions on plaintiffs' right to become a candidate, intervenors' motion to dismiss this claim is granted.

### 3. The Court Has Jurisdiction Over Plaintiffs' Claim of a Fundamental Right to Vote and to Have Their Votes Weighted Equally

#### a. Fundamental right to vote in a state election

■ Plaintiffs argue that defendant's inconsistent policies unconstitutionally violated their right to vote and to have their votes weighted equally pursuant to the equal protection clause of the Fourteenth Amendment.[2] The right of qualified electors to vote in a state election is recognized as a fundamental right under the equal protection clause of the Fourteenth

**2.** Intervenors argued that, if relief is granted to plaintiffs, the equal protection clause would be implicated in this case. *See* Intervenors Motion to Dismiss, App. C, 10–11 (Doc. No. 5). Intervenors claim that if the hand-delivered ballots are not counted the voters, who submitted absentee ballots by following the policies of the Board of Elections, would have no opportunity to resubmit their absentee ballots and their fundamental right to vote would be violated.

Amendment. *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 665, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). This fundamental right to vote is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds v. Sims*, 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). The right to vote extends to all phases of the voting process, from being permitted to place one's vote in the ballot box, *Ex parte Yarbrough*, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884), to having that vote actually counted. *United States v. Mosley*, 238 U.S. 383, 386, 35 S.Ct. 904, 59 L.Ed. 1355 (1915). Thus, the right to vote applies equally to the "initial allocation of the franchise" as well as "the manner of its exercise." *Bush v. Gore*, 531 U.S. 98, 104, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). Once the right to vote is granted, a state may not draw distinctions between voters that are inconsistent with the guarantees of the Fourteenth Amendment's equal protection clause. *Harper*, 383 U.S. at 666, 383 U.S. 663.

### b. Dilution of the right to vote violates equal protection

The United States Supreme Court has further recognized that this fundamental right to vote "can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555, 84 S.Ct. 1362. This theory of "voter dilution" has its ori-

gins in a long line of reapportionment cases in which the Supreme Court determined that the malapportionment of congressional and state legislative districts violates the equal protection clause of the Fourteenth Amendment. *See Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Hadley v. Junior College District*, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970).

■ In *Reynolds*, the Supreme Court enunciated the "one person, one vote" standard. The Court determined that the equal protection clause of the Fourteenth Amendment proscribed that "one person's vote must be counted equally with those of all other voters in a State." *Id.* at 560, 84 S.Ct. 1362.[3] In other words, "whenever a state or local government decides to select persons by popular election to perform governmental functions, [equal protection] requires that each qualified voter must be given an equal opportunity to participate in that election...." *Hadley*, 397 U.S. at 56, 90 S.Ct. 791.

Although the reapportionment cases dealt with situations where population deviations across legislative districts resulted in the inequitable and unconstitutional debasement of the voting franchise, the principle that vote dilution unconstitutionally violates equal protection extends to matters beyond malapportioned legislative districts. The United States Supreme Court recently stated: "[h]aving once granted

---

**3.** The *Reynolds* Court approvingly cited a dissenting opinion in *South v. Peters*, 339 U.S. 276, 279, 70 S.Ct. 641, 94 L.Ed. 834 (1950), in which Justice Douglas dissented from the Court's holding that a Georgia malapportionment case was a non-justiciable political question (a proposition later overruled by *Baker v. Carr, supra* ). In his dissenting opinion, Justice Douglas wrote:

There is more to the right to vote than to mark a piece of paper and drop it in a box

or the right to pull a lever in a voting booth. The right to vote includes the right to have the ballot counted.... It also includes the *right to have the vote counted at full value without dilution or discount.... That federally protected right suffers substantial dilution ... [where a] favored group has full voting strength ... [and][t]he groups not in favor have their votes discounted.*
(Emphasis added).

the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore,* 531 U.S. at 104–05, 121 S.Ct. 525.

In *Bush v. Gore,* the Supreme Court considered the situation where several counties in the state of Florida employed different standards to discern legal votes during manual recounts of votes cast for the President of the United States. The Florida Supreme Court, after candidate Gore contested the election certification, ordered a manual recount of 9,000 "undervotes" (ballots where the voting machine was unable to detect a vote for President) in Miami–Dade County, finding that there were "legal votes sufficient to place the results of this election in doubt." *Gore v. Harris,* 772 So.2d 1243, 1261 (2000). The Florida Supreme Court went on to define a "legal vote" as "one in which there is a 'clear indication of the intent of the voter,' " and remanded the case back to the Florida Circuit Court for that court to use its discretionary powers under the state election code to provide appropriate relief under the circumstances. *Id.* at 1261–62. The Florida Supreme Court further ordered that manual recount totals from Miami–Dade, Palm Beach, and Broward Counties be included in the previously-certified total. *Bush v. Gore,* 531 U.S. at 107, 121 S.Ct. 525.

Although the Florida Supreme Court defined the term "legal vote" in its opinion, there was no further indication of what the phrase "clear indication of the intent of the voter" entailed in practice. Thus, the Florida Supreme Court, through allowing the manual recount totals from Miami–Dade, Palm Beach, and Broward Counties to be included in the certified total, *sub silentio* affirmed each county's separate standards to determine what constituted a legal vote. As the United States Supreme Court noted in its opinion:

[E]ach of the counties used varying standards to determine what was a legal vote. Broward County used a more forgiving standard than Palm Beach County, and uncovered more than three times as many votes, a result markedly disproportionate to the difference in population between the counties. In addition, the recounts in these three counties were not limited to so-called undervotes but extended to all of the ballots. The distinction has real consequences. A manual recount of all ballots identifies not only those ballots which show no vote but also those which contain more than one, the so-called overvotes. Neither category will be counted by the machine. This is not a trivial concern. At oral argument, respondents estimated there are as many as 110,000 overvotes statewide. As a result, the citizen whose ballot was not read by a machine because he failed to vote for a candidate in a way readable by a machine may still have his vote counted in a manual recount; on the other hand, the citizen who marks two candidates in a way discernible by the machine will not have the same opportunity to have his vote count, even if a manual examination of the ballot would reveal the requisite indicia of intent. Furthermore, the citizen who marks two candidates, only one of which is discernible by the machine, will have his vote counted even though it should have been read as an invalid ballot.

*Id.* at 107–08, 121 S.Ct. 525.

The mechanism in place for conducting the manual recount was flawed in several aspects. First, each of the three Florida counties employed different guidelines to discern whether a ballot contained a legal vote. Second, within each county there was evidence that the guidelines were ambiguous, and that different members of the county canvassing boards applied different

standards to determine whether a vote was legal. *Id.* at 106, 121 S.Ct. 525. Third, the Florida Supreme Court included "overvote" results in these three counties, to the exclusion of the other sixty-four counties in the state where the approximately 110,000 statewide overvotes were not counted. Finally, the Florida Supreme Court certified a partial recount total from Miami–Dade County, while concurrently ordering the manual recount of the 9,000 remaining "undervote" ballots, a practice that the United States Supreme Court determined "gives no assurance that the recounts included in a final certification must be complete." *Id.* at 108, 121 S.Ct. 525.

In *Bush v. Gore,* several groups were arguably granted greater voting strength than others across the state of Florida. For example, the more lenient standards employed by Broward County resulted in three times the amount of undervotes being counted in that county than in Palm Beach County, an outcome that did not comport to the population difference between the two counties and arguably gave Broward County voters greater voting strength than their Palm Beach County counterparts. *Id.* at 107, 121 S.Ct. 525. Also, voters in Broward, Miami–Dade, and Palm Beach Counties whose ballots contained overvotes were granted greater voting strength than voters in the other sixty-four Florida counties whose approximately 110,000 overvotes were not considered. Finally, voters in Miami–Dade County whose votes belonged to the partial recount totals ordered to be certified by the Florida Supreme Court were arguably granted greater voting strength than other voters statewide whose votes were already certified pursuant to provisions in the state election code.

The United States Supreme Court, reviewing each of these procedural deficiencies *in toto,* determined that the recount process mandated by the Florida Supreme Court was "inconsistent with the minimum procedures necessary to protect the fundamental right of each voter" in the statewide recount. *Id.* at 109, 121 S.Ct. 525. The United States Supreme Court did not address which of the four different mechanisms described above were separately flawed under the equal protection clause. The Court did determine, however, that, as a whole, the implementation of different standards through the statewide recount procedure was not conducted "in compliance with the requirements of equal protection and due process." *Id.* at 110, 121 S.Ct. 525. By employing different standards within the three different counties, allowing overvotes within these counties to be voted to the exclusion of over 100,000 other overvotes across the state, and allowing partial recounts from Miami–Dade county to be certified, the Florida Supreme Court ratified a system of "uneven treatment" that resulted in the debasement of votes statewide. *Id.* at 107, 121 S.Ct. 525.

The United States Supreme Court suggested that uniform statewide standards had to be adopted in order to correct this constitutional infirmity, a process that was impossible under the dual time constraints of federal and state law implicated in the Presidential election. *Id.* at 109–10, 121 S.Ct. 525. A state must impose uniform statewide standards in each county in order to protect the legality of a citizen's vote. Anything less implicates constitutional problems under the equal protection clause of the Fourteenth Amendment. As the Supreme Court noted, "[t]he idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government." *Id.* at 107, 121 S.Ct. 525 (quoting *Moore v. Ogilvie,* 394 U.S. 814, 819, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969)).

### c. Statewide vote dilution

For purposes of a motion to dismiss, this court is mindful of its duty to examine the complaint independently to determine if the factual allegations set forth could provide relief under any viable legal theory. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Neither the parties nor the intervenors addressed the ramifications of defendant's absentee ballot practices to the results of the *statewide* November 4, 2003 election. As demonstrated by the absentee ballot introduced into evidence at the hearing, there were several statewide elections across the Commonwealth of Pennsylvania on November 4, 2003. These races included the election of a Pennsylvania Supreme Court Justice, the election of three Pennsylvania Superior Court Judges, several statewide judicial retention elections, and two proposed amendments to the Pennsylvania Constitution. *See* Pls.' ex. 2.

It is with these statewide elections that the court is concerned, because the evidence introduced at the hearing demonstrates that at least two Pennsylvania counties, Allegheny and Philadelphia Counties, employ different standards to determine whether a third-party hand-delivered absentee ballot constitutes a legal vote. The evidence is clear that Allegheny County has, for some time, permitted third-party hand-delivery of absentee ballots. Whether this practice is permissible under Pennsylvania law, as the court discussed above, is a question for Pennsylvania courts to determine pursuant to the comprehensive challenge procedures in place under the election code. *See* CLIFFORD LEVINE AND DAVID MONTGOMERY, POST-ELECTION LITIGATION IN PENNSYLVANIA, 41 DUQ.L.REV. 153 (2002) (containing a thorough discussion of post-election litigation issues arising in Pennsylvania).

There is, however, evidence that Philadelphia County at the very least, and possibly other Pennsylvania counties, prohibit the practice of third-party hand-delivery of absentee ballots of non-disabled persons. *Marks v. Stinson*, 19 F.3d 873, 878 (3d Cir.1994). In fact, Philadelphia County is under an injunction issued by the United States District Court for the Eastern District of Pennsylvania that prohibits third-party hand-delivery of absentee ballots. *Marks v. Stinson*, No. Civ. A. 93–6157, 1994 WL 146113, at *31 (E.D.Pa. April 26, 1994) (read "in person" strictly and found this provision was violated "by accepting over one thousand completed absentee ballots from Stinson Campaign workers and Democrat Committee persons.").[4] Whether the phrase "in person" in section 3461.6(a) of the election code precludes third-party hand-delivery of absentee ballots raises a question of statutory interpretation. In this election, if the statutory phrase is interpreted to be directory, the result could be that third-party hand-delivered absentee ballots will be counted in Allegheny County, but not in Philadelphia County. That kind of result would be constitutionally troubling.

Defendant, after the issue was raised whether third-party hand-delivery of absentee ballots was permissible, continued its original policy for a period of time and thereafter implemented two new inconsistent policies relating to hand-delivered absentee ballots between October 6 and October 31, 2003. The Board of Elections' third solution was pragmatic. It permitted a surrogate to hand-deliver another's absentee ballot by presenting identification and signing a certification. In doing so, however, defendant failed to alleviate the constitutional problem because hand-delivered absentee ballots in Allegheny County

---

4. The underlying concern in that case, massive election fraud that was proved to the satisfaction of the district court, is not present in this case.

are still being treated differently than those in Philadelphia County. This problem is compounded by the Allegheny County Solicitor's disclosure at the hearing that he believed the longstanding county policy permitting third-party delivery of absentee ballots violated the absentee ballot provision of the election code.

■ The proper interpretation of 25 PA. STAT. ANN. § 3146.6(a)—whether or not the phrase "in person" is mandatory—is an unsettled question which should be resolved by the state courts. If the state courts hold that the phrase "in person" is merely directory, then different standards have been employed in different counties across the Commonwealth of Pennsylvania to determine whether an absentee ballot should be counted. That kind of disparate treatment implicates the equal protection clause because uniform standards will not be used statewide to discern the legality of a vote in a statewide election. Voters in Allegheny County who take advantage of defendant's policy of permitting the third party hand-delivery of absentee ballots of non-disabled persons may be afforded greater voting strength than similarly-situated voters in Philadelphia County. Because of these different *statewide* standards, plaintiffs state a justiciable claim that defendant's policies violate the equal protection clause of the Fourteenth Amendment, and this federal claim cannot be dismissed.

### d. Vote dilution in a strictly local county election

■ No clear violation of equal protection was discerned as among plaintiffs, voters in Allegheny County, and those absentee voters in Allegheny County who took advantage of the county's practice of permitting third-party hand-delivery of absentee ballots. The equal protection clause

would arguably not be implicated by the application of different standards in a *strictly* local county election. The United States Supreme Court in *Bush v. Gore* expressly declined to address "whether local entities, in the exercise of their expertise, may develop different systems for implementing elections." *Id.* at 109, 121 S.Ct. 525. If this election was strictly local, i.e., it did not involve any statewide election, it is unclear whether absentee voters who took advantage of defendant's different practices were granted greater voting strength than other voters within the county because *all* county voters would have been able to avail themselves of the policies.[5]

Furthermore, this is not a situation like the manual recount process in *Bush v. Gore,* where different county canvassing election board members were applying different standards *at the same time* in defining a legal vote. In that case, all of the votes had been cast, and the alleged voter dilution arose through the inability of county canvassing officials to agree on a proper interpretation of their own policies. Here, the absentee ballots in Allegheny County were treated in different manners at different times, but within each time frame they were treated the same.

Defendant's different policies, as among voters in Allegheny County, may not have violated plaintiffs' equal protection rights because absentee voters could have taken advantage of the different policies in order to vote in the November 4, 2003 election. Voters within Allegheny County were not treated differently because all voters had the opportunity to have a third person hand-deliver their ballot at certain times. On these grounds, this court cannot find an equal protection violation among Allegheny County voters based upon the

---

**5.** The court is not addressing whether the lack of publication of the policies, other than by a posting at the office of the Board of Elections, raises any state or federal issues.

Board of Elections' application of three different standards for hand-delivered absentee ballots.

### D. This Court Has Supplemental Jurisdiction Over Plaintiffs' State Law Claim That Defendant Violated the Pennsylvania Election Code

In the verified complaint, plaintiffs invoke this court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367, by alleging that defendant's practice of accepting third-party delivery of absentee ballots violates several provisions of the election Code, including 25 PA. STAT. ANN. § 3146.6(a). Intervenors argue plaintiffs failed to state a claim upon which relief can be granted.

Section 3146.6, entitled "Voting by absentee electors" specifies the procedures absentee electors are to follow once their absentee ballot applications have been approved by defendant.[6] The section mandates that absentee electors mark the ballot and place it in an envelope entitled "Official Absentee Ballot," which, in turn, is placed in another envelope containing a declaration of the elector and the address of the elector's county board of election. *Id.* The section requires that "[s]uch envelope shall then be securely sealed and *the elector shall send same by mail, postage prepaid, except where franked, or deliver*

*it in person to said county board of election." Id.* (emphasis added).

In this case, plaintiffs allege valid claims that defendant violated section 3146.6(a) of the election code, albeit at different times by reason of the changes in standards applied by the Board of Elections. Plaintiffs allege, with respect to the first and third standards applied by the Board of Elections, that defendant permitted the third-party hand-delivery of absentee ballots in contravention of a strict reading of section 3146.6(a). Plaintiffs allege that the phrase "in person" requires the actual absentee voter, and not a third person or a surrogate, to deliver the ballot to the Board of Elections. As noted above, the United States District Court for the Eastern District of Pennsylvania has determined that the phrase "in person" is a mandatory phrase, requiring strict compliance. *Marks v. Stinson,* No. 93–6157, 1994 WL 146113, *31 (E.D.Pa. April 26, 1994).

Furthermore, plaintiffs stated a valid claim that defendant's "second" policy, in place from October 22, 2003 to October 27, 2003, violated both state and federal law. The Pennsylvania Commonwealth Court held that the election code does not preclude disabled persons from designating agents to mail *or hand-deliver* their absentee ballots for them. *DiPietrae v. City of Philadelphia,* 666 A.2d 1132, 1135–36 (Pa.

---

**6.** Plaintiffs assert that section 3146.6a, entitled "Assistance in voting by certain absentee electors," which governs absentee voting procedures for disabled voters, was violated. The section permits disabled absentee voters to

> receive assistance in voting (1) if there is recorded on his registration card his declaration that he has a physical disability which renders him unable to see or mark the official absentee ballot, the exact nature of such disability being recorded on such registration card; (2) if such elector requiring assistance submits with his application

for an official absentee ballot, a statement setting forth the precise nature of the disability which renders him unable to see or mark the official absentee ballot and that to the best of his knowledge and belief he will still suffer from the said physical disability at the time of voting his official absentee ballot.

25 PA. STAT. ANN. § 3146.6a. The court does not find a claim was stated for violation of that section because the issue raised here involves the method of delivery of absentee ballots and not the marking of the ballot.

Cmwlth.1995), *aff'd.*, 543 Pa. 591, 673 A.2d 905 (1996) (recognized the "very different dilemma of carefully balancing the interests of the public in having fraud-free elections with the interests of disabled electors in being able to exercise their constitutional right to vote without undue hindrances"). The court in *DiPietrae* relied on the election code, as well as the federal Americans with Disabilities Act, 42 U.S.C. § 12132, and the Voting Rights Act, 42 U.S.C. § 1973aa–6, to determine that a lower court could require that disabled absentee voters be permitted to have a third-party mail or personally deliver their ballots to the board of elections. *Id.* at 1135.[7] Plaintiffs stated a claim because defendant's second policy that absentee ballots could not be hand-delivered by a third-party was absolute. That is, there was no exception for disabled voters in accordance with *DiPietrae* and federal law.

Intervenors' motion to dismiss plaintiffs' state law claims asserting that the election code was violated is denied.

### E. Plaintiffs' Complaint Fails to State a Claim That Defendant Engaged in a Civil Conspiracy

▮▮▮▮ Plaintiffs invoke this court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367, by alleging that defendant "through its current members, has conspired with itself and with various officials and representatives of Allegheny County to violate the Pennsylvania Election Code" as well as plaintiffs' statutory and constitutional rights. Pls.' Compl. ¶ 39. Under Pennsylvania law, a cause of action for civil conspiracy requires the existence of all of the following elements of the cause of action:

(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose;

(2) an overt act done in pursuance of the common purpose; and

(3) actual legal damages.

*Landau v. Western Penn. Nat'l Bank,* 445 Pa. 217, 282 A.2d 335 (1971). Furthermore, plaintiffs are required to allege and prove malice—that is, an unlawful intent to injure absent justification. *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 412 A.2d 466, 472 (1979).

▮▮▮▮ In this case, plaintiffs failed to state a claim that defendant engaged in a civil conspiracy. Plaintiffs alleged that defendant combined with another person or entity (i.e., a political party) to unlawfully violate plaintiffs' constitutional and statutory rights. Plaintiffs' complaint is filled with allegations regarding defendant's role in an alleged civil conspiracy. In several places in the complaint, plaintiffs argue that defendant's practice "invites election fraud," "encourages and facilitates ballot fraud," "has created an opportunity for ballot fraud," and "likely facilitated the commission of actual absentee ballot fraud." *Id.* ¶¶ 1, 11, 12. Nowhere do plaintiffs allege, however, that defendant engaged in concerted action with an identifiable other party, or, perhaps more importantly, that defendant promulgated its three inconsistent poli-

---

7. The *DiPietrae* court stated:

[T]he trial court properly allowed a disabled voter to appoint a person of his or her choice to obtain an absentee ballot application, to deliver it to the Election Board, to obtain an absentee ballot from the Board, and to deliver the completed ballot either to the mailbox or to the Board. **The trial court's proviso that 'an individual cannot be the agent for persons living in more than one household' appears to be a reasonable means of balancing the rights of a disabled person who wishes to vote with the public need to insure a fair election.** *DiPietrae,* 666 A.2d at 1135–36 (emphasis added).

cies out of an intent to injure plaintiffs. Plaintiffs did not proffer any evidence at the hearing that defendant, or anyone else for that matter, engaged in fraudulent activity regarding defendant's policies. For these reasons, intervenors' motion to dismiss plaintiffs' civil conspiracy claim is granted.

## II. Abstention/Injunctive Relief

Intervenors assert that, even if the court determines it has subject-matter jurisdiction over this case, the court should abstain under the *Younger* doctrine, as well as the *Pullman* and *Burford* doctrines. Before separately addressing the application of each of these doctrines, it is important to note the instructions of the United States Supreme Court that "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress" and that only in "exceptional circumstances" may federal courts decline to exercise jurisdiction. *Quackenbush v. Allstate Insur. Co.*, 517 U.S. 706, 716, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (internal citations and quotations omitted).

### A. *Younger* Abstention Doctrine Does Not Apply

■ In the landmark case *Younger v. Harris*, 401 U.S. 37, 53–54, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the United States Supreme Court held that, as a general rule, principles of equity, comity and federalism require that federal courts should not enjoin a state criminal prosecution begun prior to the institution of the federal suit so long as the moving party has an adequate remedy at law and the state proceeding involves important state interests. This doctrine was later expanded to include noncriminal judicial proceeding in which important state interests are involved. *See Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982). *See also Juidice v. Vail*, 430 U.S. 327, 335, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) (holding that *Younger* abstention principles apply in more than just criminal or quasi-criminal proceedings). *Younger* abstention "reflects a strong federal policy against federal-court interference with pending state judicial proceedings." 457 U.S. at 431, 102 S.Ct. 2515.

■ The *Younger* doctrine typically applies when a plaintiff in federal court is attempting to enjoin judicial proceedings in state court. *See Marks v. Stinson*, 19 F.3d 873, 882 (3d Cir.1994) ("federal court will only consider *Younger* abstention when the requested equitable relief would constitute federal interference in state judicial or quasi-judicial proceedings"); *Olde Discount Corp. v. Tupman*, 1 F.3d 202, 212 (3d Cir.1993) (noting *Younger* abstention doctrine applies to injunctions against ongoing state criminal proceedings under appropriate circumstances); *Port Authority Police Benevolent Ass'n, Inc. v. Port Authority of New York*, 973 F.2d 169, 177 (3d Cir.1992) (holding that the district court properly dismissed the complaint because the New York state court had already entered a preliminary injunction and both the *Younger* abstention doctrine and the *Rooker–Feldman* doctrine were proper grounds for dismissal of the complaint).

■ *Younger* abstention is appropriate when the following requirements are met: (1) the state proceedings are judicial in nature; (2) the proceedings implicate important state interests; and (3) the federal plaintiff has an adequate opportunity in the state proceedings to raise constitutional challenges. *See Middlesex County Ethics Comm.*, 457 U.S. at 432, 102 S.Ct. 2515 (1982); *FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834, 843 (3d Cir.1996). Here, the court finds that these conditions are not met because, early in the morning on November 3, 2003, plaintiffs filed a praecipe to

discontinue the state court proceedings and thereby ended any state court proceeding. At the time of the hearing for a preliminary injunction on November 3, 2003, no state court action was pending.

### B. While the *Pullman* Doctrine Applies, the Court Must Still Consider the Request For Preliminary Injunctive Relief

The doctrine articulated in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), provides that "when a federal court is presented with both a federal constitutional issue and an unsettled issue of state law whose resolution might narrow or eliminate the federal constitutional question, abstention may be justified under principles of comity in order to avoid needless friction with state policies." *Chez Sez III Corp. v. Township of Union*, 945 F.2d 628, 631 (3d Cir.1991) (internal quotations and citations omitted), *cert. denied*, 503 U.S. 907, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992). For example, in *Chez Sez III Corp.*, the United States Court of Appeals for the Third Circuit affirmed the district court's decision to abstain from deciding the constitutional question of whether a local zoning ordinance violated the appellants' constitutional right to freedom of expression under the First Amendment because the requirements for the *Pullman* doctrine were met. *Id.* at 634. In *Chez Sez III Corp.*, these requirements were met because how the local zoning ordinance should be interpreted was an uncertain state-law question. *Id.* at 632.

The *Pullman* doctrine requires courts to engage in a two-step process. *Id.* at 631. The first step is determining whether the following special circumstances exist: (1) uncertain issues of state law underlying the federal constitutional claims brought in federal court; (2) state law issues amenable to a state court interpretation that would obviate the need for, or substantially narrow, the scope of adjudication of the constitutional claims; and (3) the possibility that a federal court's erroneous construction of state law would be disruptive of important state policies. *Id.* (citing *D'Iorio v. County of Delaware*, 592 F.2d 681, 686 (3d Cir.1978), *overruled on other grounds*, *Kershner v. Mazurkiewicz*, 670 F.2d 440, 448 (3d Cir.1982) (*en banc*)). If the district court finds that all three of the "special circumstances" are present, it must then engage in the second step in the analysis which is to make a discretionary determination whether abstention is in fact appropriate under the circumstances of the particular case, based upon the weight of these criteria and other relevant factors. *Id.*

The doctrine espoused in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), is similar to *Pullman* doctrine. The two-step analysis in *Burford*, however, requires the district court: (1) to determine whether "timely and adequate state-court review" is available; and (2) if it is, to decide whether "the case before it involves difficult questions of state law impacting on the state's public policy or whether the district court's exercise of jurisdiction would have a disruptive effect on the state's efforts to establish a coherent public policy on a matter of important state concern." *Riley v. Simmons*, 45 F.3d 764, 771 (3d Cir.1995) (internal citations and quotations omitted).

Here, although the court finds that the *Burford* doctrine is instructive, the *Pullman* doctrine applies. All three special circumstances are met and abstention is proper under the circumstances of this case. First, the construction of the election code, 25 PA. STAT. ANN § 3416.6(a), is uncertain. It is not clear whether the absentee ballot provision in the election code requiring hand-delivery to be "in per-

son" is mandatory or directory. While the Pennsylvania Supreme Court affirmed the Pennsylvania Commonwealth Court's holding that *disabled voters* could have third parties assist them in voting by bringing them their absentee ballots and returning the ballots for them, *DiPietrae v. City of Philadelphia*, 666 A.2d at 1135, the question remains whether non-disabled absentee voters may have third parties hand-deliver their absentee ballots. Second, the construction of the absentee ballot provision at issue by Pennsylvania courts as either mandatory or directory, as discussed in this opinion, could obviate the need to determine whether there has been a violation of equal protection under the Fourteenth Amendment. Third, an erroneous construction of the absentee ballot provision of the election code could disrupt extremely important state policies concerning voting rights. Under the circumstances of this case, this court will exercise its discretion and refrain from determining the merits of plaintiffs' equal protection claim and plaintiffs' claim that the election code has been violated.

■■■ Notwithstanding a decision to abstain on the merits, this court is still obliged to consider plaintiffs' request for preliminary relief. *See New Jersey–Philadelphia Presbytery of the Bible Presbyterian Church v. New Jersey State Board of Higher Education*, 654 F.2d 868, 887 (3d Cir.1981) (holding that when a case is not to be dismissed under *Younger*, but instead the *Pullman* abstention doctrine applies, "a motion for preliminary injunctive relief ... ought ... to be considered without regard to the separate question of whether a Pullman stay of final hearing is appropriate"); *Chez Sez III Corp.*, 945 F.2d at 634 n. 4 (noting that the district court had to consider appellants' request for preliminary relief even though the court decided to abstain under the *Pullman* doctrine). The *Pullman* doctrine "requires retention of jurisdiction ... for

the obvious purpose of preserving the plaintiffs' choice of forum for the vindication of federal rights clearly infringed by the state construction ultimately adopted." *New Jersey–Philadelphia Presbytery*, 654 F.2d at 885. To determine plaintiffs' request for preliminary relief, this court must examine whether the case is to be dismissed outright or whether the traditional standard for injunctive relief applies with regard to any of plaintiffs' claims. *See id.* at 887. The court, as discussed above, holds that plaintiffs stated claims under viable theories upon which relief could be granted. Now it must be determined whether preliminary injunctive relief is appropriate.

### C. A Limited Preliminary Injunction Is Appropriate

■■■ Although the court will abstain under the *Pullman* doctrine from adjudicating the merits of plaintiffs' claims, the court is mindful of its continuing duty to consider plaintiffs' request for preliminary relief. *See id.* In determining whether to grant a preliminary injunction, the court is to consider the following four factors: (1) whether the movant has demonstrated a likelihood of success on the merits; (2) whether the movant will be irreparably harmed by the denial of injunctive relief; (3) whether the injunctive relief sought will result in greater harm to the non-movant; and (4) whether the injunctive relief sought is in the public interest. *Shire U.S. Inc. v. Barr Laboratories, Inc.*, 329 F.3d 348, 352 (3d Cir.2003); *Swartzwelder v. McNeilly*, 297 F.3d 228, 234 (3d Cir.2002); *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir.1999).

■■■ It is well-established that district courts are to engage in a balancing test to determine whether there is an overall need for a preliminary injunction. *See Oburn v. Shapp*, 521 F.2d 142, 147 (3d

Cir.1975) (stating that while the moving party generally must make a showing with regard to the first two prongs, the court is to weigh all relevant facts with regard to the four factors). The court addresses each of these factors separately and finds that, in balancing the various interests, it is appropriate for the court to issue a limited preliminary injunction that preserves the rights of voters to challenge the absentee ballots consistent with the procedures set forth in the election code.

## 1. Likelihood of Success on the Merits

In deciding the likelihood of plaintiffs succeeding on the merits of plaintiffs' equal protection claims, the court finds that there is a reasonable probability that plaintiffs' claims could succeed on the merits depending upon how the state court interprets the provision of the election code at issue, 25 PA. STAT. ANN. § 3146.6(a). As noted above, the court finds that the facts presented raise a serious equal protection claim under a theory similar to that espoused by the United States Supreme Court in *Bush v. Gore, supra.* This equal protection claim arises because the November 4, 2003 election in Allegheny County includes statewide elections and issues, and the Board of Elections' three policies for accepting hand-delivered absentee ballots were, at the very least, different from the policies in Philadelphia County. *See id.* at 109, 121 S.Ct. 525 ("When a court orders a statewide remedy, there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied.").

 To find that plaintiffs are likely to prevail on the merits, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a [p]rima facie case

showing a *reasonable probability* that it will prevail on the merits." *Oburn v. Shapp,* 521 F.2d at 148 (emphasis added). Here, the likelihood of plaintiffs' success, while a close question, appears to turn on an issue, which is more appropriate for the Pennsylvania courts to determine: whether to interpret the election code—specifically 25 PA. STAT. ANN. § 3146.6(a)—as mandatory or directory. The interpretation of this statute is crucial under both plaintiffs' equal protection claim and plaintiffs' claim based upon a violation of the election code.

For plaintiffs to succeed on the merits of their equal protection claim, plaintiffs would have to prove that: (1) the government acted; (2) in a manner that burdens their fundamental right to vote; and (3) the action was not narrowly tailored to serve a compelling governmental interest. *See Maldonado v. Houstoun,* 157 F.3d 179, 184 (3d Cir.1998). Here, there is no doubt that the Board of Elections took actions to promulgate and implement three distinct policies. The question whether these actions burdened plaintiffs' fundamental right to vote depends upon whether the election code provision requiring absentee ballots to be mailed or delivered "in person" is directory or mandatory.

This court finds it inappropriate, based upon the doctrines of comity and federalism, to speculate as to how the Pennsylvania courts would interpret this provision. *See Pullman,* 312 U.S. at 501, 61 S.Ct. 643 (holding that staying the federal court proceeding was appropriate pending authoritative determination of difficult state questions); *Haakenson v. Parkhouse,* 312 F.Supp. 929, 934 (E.D.Pa.1970) (abstaining from any decision "until the parties receive a definitive construction of state constitutional provision"). In reaching this decision, the court has carefully weighed its duty to decide to adjudicate controversies

properly before it, *see Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 14, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (emphasizing abstention is only appropriate in rare cases), against its duty to refrain from deciding difficult questions of state law whose importance transcend the case at bar and that may be disruptive of state efforts to establish a coherent policy. *See Riley v. Simmons*, 45 F.3d 764, 771 (3d Cir.1995).

Moreover, although the court chooses to refrain, consistent with the *Pullman* doctrine, from interpreting whether the provision of the election code at issue is mandatory or directory, if the state courts find the phrase "in person" in section 3146.6(a) is mandatory, the policies at issue may be determined to be invalid under state law and, thus, the constitutional issues need not be reached. If the state courts, however, find that the phrase is directory, then plaintiffs would likely succeed on the merits of their claim that there was violation of the equal protection clause because arguably the different policies in Allegheny and Philadelphia Counties would result in an unconstitutional vote dilution. In that event, considering that a different standard would apply in Philadelphia County the issue would be raised as to whether the statute as applied is constitutional.

### 2. Irreparable Harm to the Moving Party

Irreparable harm means that the moving party will be injured in such a way that adequate compensatory or other corrective relief will not be available at a later date in the ordinary course of litigation. *Oburn v. Shapp*, 521 F.2d at 151. The court finds that there would be irreparable harm to the moving party if the court fails to grant injunctive relief because it would be virtually impossible for the moving party or any other person to challenge the validity of the 937 hand-delivered absentee ballots.

Under the election code, all absentee ballots (both mailed and hand-delivered) are to be delivered to the 1307 Allegheny County precincts with the other election supplies. *See* 25 PA. STAT. ANN. § 316.8(a), (b.1), (e). Additionally, Allegheny County's Election Division Manager testified that once all the hand-delivered and mailed absentee ballots were commingled at the Board of Election's headquarters and sent out to the 1307 precincts, there would be no way to identify which of the ballots are the hand-delivered absentee ballots.

Furthermore, a survey of Pennsylvania law and the law of other jurisdictions indicates that once the ballots are commingled in such a way that they are unidentifiable, courts are limited in the types of relief that they can fashion. To avoid disenfranchisement of voters, the predominant remedy is either to count the votes or to have a new election. *See, e.g., Kauffman v. Osser*, 321 F.Supp. 327, 334 (E.D.Pa.1971) (counting the absentee ballots); *In re Contest of 1979 General Election*, 489 Pa. 404, 414 A.2d 310, 317 (1980) (counting all ballots with the exception of three); *In re Recount of Ballots*, 457 Pa. 279, 325 A.2d 303, 312–313 (1974) (counting votes); *Perles v. County Return Board*, 415 Pa. 154, 202 A.2d 538, 540 (1964) (affirming the lower court's decision to count all of the absentee votes even though some but not all of the absentee votes might have been invalid); *In re Norwood Election Contest*, 382 Pa. 547, 116 A.2d 552, 554–55 (1955) (counting the votes and stressing the importance of using "[e]very rationalization within common sense ... at saving the ballot rather than voiding it"); *Kelley v. Delaware County Board of Elections*, 19 Pa. D & C.3d 492, 497 (Pa.Com.Pl.1981) (ordering a new election when there were defective voting machines). *See also Griffin v. Burns*, 570 F.2d 1065, 1080 (1st Cir.1978) (affirming order of a new pri-

mary election); *Appeal of Soucy,* 139 N.H. 110, 649 A.2d 60, 65 (1994) (reversing decision to void election).

This court finds that plaintiffs would suffer irreparable harm without injunctive relief because under Pennsylvania law, the ballots would have been commingled at the Board of Elections headquarters and sent out to the 1307 precincts, and plaintiffs would not be able to challenge the validity of the absentee ballots that were received under a constitutionally questionable procedure.

### 3. Irreparable Harm to the Nonmoving Party

With regard to the extent to which the nonmoving party will suffer irreparable harm, the court finds that neither defendant, intervenors, nor the voters will suffer irreparable harm. Importantly, the court observes that the 937 absentee voters who had their absentee ballots delivered by agents acted through no fault of their own. They simply followed policies of the Board of Elections. Their votes, at this time, should not be voided. *Perles,* 202 A.2d at 540 ("The power to throw out a ballot … must be exercised very sparingly and with the idea in mind that … a group of voters are not to be disfranchised at an election except for compelling reasons.") (internal quotations and citation omitted). Rather, because the court enters a limited preliminary injunction that simply finds the votes to be "challenged," there will be no irreparable injury to defendant, intervenors, or the voters.

### 4. Public Interest

With regard to the public interest prong, the court finds that granting the preliminary injunction is in the public interest. As noted above, the United States Supreme Court has observed: "[t]he idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our repre-

sentative government." *Moore v. Ogilvie,* 394 U.S. at 819, 89 S.Ct. 1493. It is important that this court preserve the right of voters to challenge these 937 hand-delivered absentee ballots.

Several prominent electors who took advantage of the Board of Elections' different policies were highlighted during the hearing on November 3, 2003. Their votes, however, are no more important than those of any other voter who had his or her absentee ballot hand-delivered by a third-party. Plaintiffs, defendant, and intervenors recognized that absentee ballots of voters of both political parties were included in the 937 ballots in issue. It is noteworthy that the injunctive relief was sought as to *all* those ballots. If only ballots of Republicans *or* Democrats were at issue, the public interest prong would have been weak and the balance would not have weighed in plaintiffs' favor. Because of the importance that each elector's vote count to the same extent as other electors in other counties, it is in the public interest to grant a limited preliminary injunction.

Again it is important to note that there was no evidence that any of the parties or the Board of Elections engaged in fraudulent conduct. Rather, the court must act because of the inconsistencies between Allegheny County and Philadelphia County, which, as noted above, have created the possible problem that different standards will be employed statewide in the election. These inconsistencies may affect the rights of these 937 Allegheny County voters to have their votes counted in this election.

### 5. Preliminary Injunction Remedy

This court will enter an order requiring that these 937 absentee ballots be set aside by the Board of Elections in a secure place. As of this time, those ballots are challenged. The election code has a complex challenge scheme in place to deal with possible challenges to these votes, if neces-

sary, following the November 4, 2003 election. In preserving plaintiffs' possible constitutional challenges, this court ensures that these absentee ballots will be challenged in the manner provided for under the election code. That code, as noted in the November 3, 2003 hearing, provides a mechanism by which challenged votes are heard first by the Board of Elections with an appeals process to the court of common pleas. 25 PA. STAT. ANN. § 3146.8(e).[8] Further appeals may be taken in the nature of certiorari to the Pennsylvania Commonwealth Court or Pennsylvania Supreme Court. See LEVINE AND MONTGOMERY, 41 DUQ. L.REV. at 157. Thus, if any voter wishes to challenge the proper construction of 25 PA. STAT. ANN. 3146.6(a), that voter may do so following the election

code procedure. Any equal protection issues could, of course, be heard in state court by virtue of the state court's concurrent jurisdiction.

The burden of challenging these votes at the state level will be on plaintiffs or any other person having standing to assert a challenge. 25 PA. STAT. ANN. 3146.8(e). Electors who are having their ballots challenged will also be able to participate in the process, by virtue of statutory provisions in the election code which provide for notification to be given to the voter. Id. If the voter delivered the absentee ballot in person and not by a third party, or if the voter is disabled, that information could be brought to the attention of the Board of Elections and a challenge to those absentee ballots arguably would not succeed.[9]

---

8. Section 3146.8(e) provides in pertinent part:

With respect to the challenged ballots, they shall be returned to the county board with the returns of the local election district where they shall be placed unopened in a secure, safe and sealed container in the custody of the county board until it shall fix a time and place for a formal hearing of all such challenges and notice shall be given where possible to all absentee electors thus challenged and to every attorney, watcher or candidate who made such challenge. The time for the hearing shall not be later than seven (7) days after the date of said challenge. On the day fixed for said hearing, the county board shall proceed without delay to hear said challenges and, in hearing the testimony, the county board shall not be bound by technical rules of evidence. The testimony presented shall be stenographically recorded and made part of the record of the hearing. The decision of the county board in upholding or dismissing any challenge may be reviewed by the court of common pleas of the county upon a petition filed by any person aggrieved by the decision of the county board. Such appeal shall be taken, within two (2) days after such decision shall have been made, whether reduced to writing or not, to the court of common pleas setting forth the objections to the county board's decision and praying for an order reversing same.

Pending the final determination of all appeals, the county board shall suspend any action in canvassing and computing all challenged ballots irrespective of whether or not appeal was taken from the county board's decision. Upon completion of the computation of the returns of the county, the votes cast upon the challenged official absentee ballots shall be added to the other votes cast within the county.

9. See 25 PA. STAT. ANN. § 3146.8(e). See also Canvass of Absentee Ballots of April 28, 1964, Primary Election, 34 Pa. D & C.2d 419, 426 (Pa.Com.Pl.1964) (individual electors are permitted to appear before the county elections board and "justify their use of the absentee ballot"); Decision of County Board of Election, 29 Pa. D & C.2d 499, 502 (Pa.Com.Pl. 1962) (where individual absentee electors whose votes had been challenged testified before board of elections that they were away from polling place on election day, board of elections deemed absentee ballot to be valid); cf. 25 PA. STAT. ANN. § 3050(d) (providing that electors whose vote is challenged on election day as to voter registration or residency in election district may submit an affidavit another qualified elector of the election district as a witness, "who shall make affidavit of his identity or continued residence in the election district."); 25 PA. STAT. ANN. § 3050 et seq. (as amended, effective December 9, 2003) (per-

The court believes that this remedy strikes a fair balance among the constitutional issues, an important unsettled issue of state law in this case, and the need of the public to ensure fair elections.

### Conclusion

AND NOW, this 13th day of November 2003, after consideration of the evidence, oral arguments, and the parties' submissions, **IT IS ORDERED** that the motion for temporary restraining order/preliminary injunction filed by plaintiffs (Docket No. 2) and the motion to dismiss filed by the intervenors (Docket No.5) are **both GRANTED IN PART** as follows **and DENIED IN ALL OTHER RESPECTS:**

With regard to the motion for temporary restraining order/preliminary injunction:

**IT IS HEREBY ORDERED,** that the 937 hand-delivered absentee ballots are challenged and shall be set aside in a secure location at the office of the Board of Elections.

**IT IS FURTHER ORDERED** those ballots may be challenged consistent with 25 PA. STAT. ANN. § 3146.8(e) in the same manner and subject to the same procedures and appeal rights as other challenges under that law and that plaintiffs or any other challenger shall post $10.00 per challenged vote.

**IT IS FURTHER ORDERED** that the Board of Elections shall produce a list of the electors, by precinct, whose hand-delivered absentee ballots are being challenged no later than Thursday, November 6, 2003 and shall produce no later than Friday, November 7, 2003, another list of those electors who presented hand-delivered absentee ballots and who identified themselves as having a "physical disability or illness" on their ballot applications, which lists shall be made available to the parties in this case and the public.

With regard to the motion to dismiss, the court finds that plaintiffs stated claims under the equal protection clause of the Fourteenth Amendment and for violations of the election code; however, the court abstains from evaluating the merits of these claims, consistent with the *Pullman* doctrine.

mitting a "provisional vote" where a challenge is made to voter registration at the polling place); *Appeal of Harris,* 332 Pa. 457, 2 A.2d 301 (1938) (court held that, in circumstances where a voter's registration card was not produced at the polling place, the elector was permitted to apply on election day to a judge of the court of common pleas for an order requiring election officials to receive the elector's vote if the judge was satisfied the elector was duly registered and was not permitted to vote because his registration card was not produced through no fault of his own).